UNITED STATES of America, Appellee,

v.

Ronald Henry GLANTZ,
Defendant, Appellant.

No. 87–1121.

United States Court of Appeals,
First Circuit.

Heard Dec. 9, 1987.

Decided May 16, 1988.

John A. MacFadyen, Providence, R.I., for defendant, appellant.

John M. Campbell, U.S. Dept. of Justice, Public Integrity Section, Crim. Div., with whom Sara M. Lord, U.S. Dept. of Justice, Public Integrity Section, Criminal Div., and William F. Weld, Asst. Atty. Gen., Criminal Div., Washington, D.C., were on brief, for appellee.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

Ronald Glantz appeals his conviction of perjury and conspiracy to obstruct justice in connection with testimony before a federal grand jury. He argues that the district court failed to recognize that one of his false statements before the grand jury was "literally true" and thus not perjurious as a matter of law. He also claims the district court committed reversible error by giving faulty jury instructions. We disagree and affirm the convictions.

I

When the convoluted business dealings that ultimately led to this prosecution began, Mr. Glantz was a part owner of Eticam Corporation, a company involved in importing foreign waste treatment technology. This company needed financing for its projects. To that end, it contracted with Financial Resources, Inc. to create a third corporation, Eticam Programs, Inc. (EPI). Financial Resources itself was formed by several investors apparently for the sole purpose of creating EPI. These investors included several characters who would play a role in Mr. Glantz' downfall: Joseph Guido, Young Sik Woo, and, especially, Jacob Perl. Their role within EPI was to locate sources of funding for Eticam projects. Eticam and Financial Resources each owned fifty percent of EPI.

In early 1982, Eticam was looking for a location in Rhode Island to build a waste treatment facility. Glantz contacted Michael Farina, a longtime friend and real estate broker, for assistance. Mr. Farina informed Glantz of a piece of property in Warwick, Rhode Island (the "Knight Street property") which could satisfy the firm's needs. This property was owned by Joseph and Anna Migliaccio and Anthony Capuano (or, as referred to by most of the individuals involved in this case, "the Migliaccios and Capuanos," a term we adopt for purposes of this opinion). Farina would later testify that he told Glantz the property was worth approximately $300,000 but that he, Farina, could probably purchase it for less than $200,000. According to Farina, they then agreed that Glantz would receive fifty percent of any profit Farina realized on the sale of the land to Eticam. Farina subsequently paid $300 for an option to buy the property.

In the spring of 1982, Glantz told Perl about the Knight Street property and informed him that it could be purchased for $300,000. Perl passed this information on to his co-investor in Financial Resources, Young Sik Woo. Woo then agreed with Hung Sik Woo (collectively the "Woos") to buy the land for $300,000 and resell it to EPI for $360,000. Perl was to share this profit. The record suggests that none of the individuals in this menagerie of profit-seekers fully disclosed their potential private profit from the land transaction which ostensibly was to be for the collective benefit of EPI, Eticam, and Financial Resources.

On July 1, 1982, there was a double closing on the Knight Street property. First, Farina purchased the property from the Migliaccios and Capuanos for $150,000. He then resold the property to the Woos for $314,000. (The cost over $300,000 was part of a sewer fee). The Woos were not present at the closing but were represented by Glantz as their attorney. Because of fees associated with the closings, the actual amount payed to Farina when the proceeds from the sales were distributed was approximately $141,000.

Farina's wife, Barbara, subsequently deposited these proceeds into their bank account and, on the same day, prepared a check payable to Ronald Glantz in the amount of $70,350. On the check, she wrote the notation "consulting fee." Mr. Farina would testify that this amount represented one-half of his $140,700 profit on the Knight Street property sale: $141,000 less the $300 non-refundable deposit he had payed Mr. Migliaccio.

The relationship between the EPI parties soon deteriorated. In October, Eticam claimed, and an arbitrator agreed, that Financial Resources had breached the EPI contract by failing to secure financing for Eticam projects. Around the same time, Perl, spurred by suspicion or vindictiveness, began accumulating evidence of Glantz' secret profits from the Knight Street property deal. He obtained copies of the deeds which showed that Farina had purchased the land for $150,000 and that it

was Farina, not the Migliaccios and Capuanos, who had sold the land to the Woos. He also searched Glantz' desk, discovering that Glantz had received the $70,350 check from Farina just after the closing. Perl would testify that he soon thereafter privately asked Glantz about Farina's apparent profit on the deal and was told that this money had been passed on in cash to the sellers of the land.

Unsatisfied and questing for further evidence of impropriety, Perl set up a meeting between Glantz and the Financial Resources investors. Perl wore a hidden tape recorder at the meeting. The following are excerpts from the conversation Perl recorded:

PERL: And there is more than that. Bank asked for some documentation, which we obtained from Pari, and aah . . . they also made the comment about a very strange transaction. So we basically would like to have you go through the transaction and explain what . . . what happened and why. So everybody understands.

\*　　\*　　\*　　\*　　\*　　\*

GLANTZ: Well. All right. Two things. Number one with regard to the transaction. There was a double closing of the land. A double closing on the land. And I don't know the figures, but the figures you would have in the file, whatever it was, and that was for tax considerations on the property. (Unintelligible) six families involved . . . in fact, where there were more than six people, but there was other families involved. As to what they bought the land for, and it went through, that stays here. So you know.

PERL: Yeah.

GLANTZ: That's for . . . that's, that was for governmental reasons and tax reasons, tax considerations. But they were paid $314,000 for the property. Okay?

PERL: Yeah, I have the things from aah . . . what's his name, from Pari.

GLANTZ: Okay.

PERL: And in the things there is about hundred . . . over $140,000 that

was paid to Farina ... according to that. That's the money that we need explained.

GLANTZ: That's the double closing. That money was a pass through.

PERL: So where did it go to?

GLANTZ: It went right back to the people ... in cash.

\* \* \* \* \* \*

PERL: So are you saying that [Farina] did not get compensated by us ... at all?

GLANTZ: Nothing. Not a penny.

PERL: All of that money that he received, that hundred, what ever it was, 140,000, and so on, he paid them back in cash?

GLANTZ: That all goes through a (unintelligible). It all went through his company. That's got, that has nothing to do with Eticam or ... or anything. There's no checks back and forth to us or nothing. That's all accountable....

\* \* \* \* \* \*

PERL: Okay? We were ... and in fact there's a memo at the bank that says we're buying it from Migliacci and Capuanos. And they didn't know how many people were involved. Okay? I guess they know now because they have the information from Pari. And, you know, now they looking at things, and they looking at the deed. The land was bought from Farina. Okay? And we also, we were concerned about it. Why was the land bought from Farina? Not from Migliaccio and Capuanos?

GLANTZ: I told you why. I would never ... repeat it, but I'll tell you, you know, you ... you can go repeat it. I'm not gonna tell you why.

\* \* \* \* \* \*

GLANTZ: They [the bank] think there's something illegal, let them go tomorrow to the Attorney General in the State of Rhode Island, or let them go to wherever they want to go. This is nothing illegal. The point of the matter is, the illegality ...

PERL: Um humm.

GLANTZ: is of the Migliaccios wanting not to pay all the taxes on the land. Okay? That's one thing. All right?

They got an appraisal. Whatever they are supposed to do as a bank, they're supposed to do.

Two months later, Perl sought justice by turning over the tape to the FBI. Soon thereafter, Glantz and Michael and Barbara Farina were subpoenaed to appear before a grand jury. It was at this point, the government argued at trial, that Glantz initiated the conspiracy to obstruct justice by plotting with the Farinas to fabricate a false story they would present to the grand jury regarding the $70,350 payment to Glantz. According to the Farinas, who provided testimony at the trial below in exchange for immunity from prosecution for their role in the conspiracy, they and Glantz met several times prior to going before the grand jury and agreed to explain the payment as consulting fees plus interest for services Glantz provided on a real estate closing several years earlier (the so-called "Joyal" deal). The Farinas testified that the three agreed to deny that the payment was in any way connected with the Knight Street deal, except to assert that the Farinas' profit from that deal allowed them to pay off their past debt to Glantz.

On March 31 and April 28, 1983, Glantz and the Farinas, respectively, testified before a grand jury that the reason for the payment to Glantz was the Joyal deal. Glantz specifically denied that the payment was related to the Knight Street transactions. The government charged that this testimony was perjurious and was an overt act in furtherance of a conspiracy to obstruct justice. These allegations substantially constituted Counts One and Two of Glantz' indictment in the trial below.

Count Three of the indictment ultimately was based on the following additional testimony by Glantz before the grand jury:

Q. Were you aware that Mr. Farina was going to receive approximately $140,000?

A. I knew he was making a profit on the land. Yes.

Q. In the vicinity of $140,000?

A. Whatever the number is. I don't know what the number is.

Q. Was that $140,000 ever passed on to the Migliaccios or the Capuanos, in any way passed to them?

A. You mean by way of payment to them?

Q. That's right.

A. No.

Q. Did you ever tell anyone that that money was passed on to them?

A. *Absolutely not.*

The government charged that the statement, "Absolutely not," was false.[1] Its proof would consist primarily of the tape recording surreptitiously made by Perl at the meeting.

At his trial, Glantz' defense to Counts One and Two was primarily an attack on the credibility of the Farinas, attempting to show that there was no reason to believe that they were being more truthful when recanting their grand jury testimony than when they were giving it. The jury obviously found the more recent version of the Farinas' explanation of the payment to Glantz, the Knight Street deal, to be more credible. While not agreeing with that conclusion, Glantz does not directly attack it on this appeal.

As to Count Three, Glantz presented a "literal truth" defense. In essence, he argued that his response—"Absolutely not," to the question, "Did you ever tell anyone that the money was passed on to them?"—was literally true because, at the meeting with Perl and his associates, he never used the precise phrase "the money was passed on to them." On appeal, Glantz has not only abandoned this argument, but denies he ever made it;[2] instead, he now presents

---

1. Count Three originally charged Glantz with making several other perjurious statements to the grand jury. These are shown as the underlined statements below.

    Q. Now, didn't you, at that meeting—weren't you, at that meeting, questioned by Mr. Perl and Mr. Guido and Mr. Woo about the $140,000 that Mr. Farina made on this deal?
    A. *Absolutely not.*
    Q. You were not questioned at all, no one asked you, "Why did that guy make $140,000 on the deal"?
    A. *No, no one asked me that.*
    Q. And you didn't tell anybody that Farina didn't make that money on the deal, that that was a pass through, that the money went right to the sellers of the land, and it was done to avoid taxes?
    A. *Absolutely not.* Avoid whose—if I may say, the reason I wouldn't make a statement like that is somebody has to pay income taxes on it. So how does it avoid taxes, and the answer to your question is no.
    Q. No, you never made a statement to that effect?
    A. *Never made a statement like that.*
        *      *      *      *      *      *
    Q. Mr. Glantz, at this meeting in November or thereabouts, that we've been discussing, you never said that there was a double closing on the land, and the money went through, went through for governmental reasons, for tax reasons, that they were paid $314,000 for the property?
    A. *I did not.* I've said that before.
    Q. You never said that it went right back to the people in cash?
    A. *Absolutely, unequivocally no.* Anna Migliaccio is an old lady, with due respect, I'm not—she's not that old, I mean, with due respect. I mean, her husband passed away. She's a widow.

    The court ruled, however, that because the questions were asked in terms of double negatives, Glantz' responses were literally true as a matter of law.

2. In his brief, appellant asserts that this characterization of his "literal truth" argument at trial is "absurd." He argues that defense counsel "was not being nearly so literal." The record, however, suggests otherwise. To the jury, defense counsel argued: "And they didn't ask him the right question. The fact of the matter is they had this tape there and they could have quoted him right from the tape and said did you say that, and they didn't. But they didn't. And the fact they didn't, and the fact he answered this way, and that with regard to that particular issue, is not a crime." Record for December 11, 1986 at 57. To the court, he argued: "That's why it's not often perjury cases are brought on what did you say. They're brought on what did you do. And when they are brought on what did you say they're confined very restrictively to tracking the words used in that regard because what people say is a fact.... [I]f the Government is going to be permitted to bring you in the grand jury and do that, they must restrict themselves to the words you used. And if they don't do that then they are at their own peril.... Any prosecutor worth his salt or who was exercising the requisite acquity (sic) so-called as stated in the Supreme Court would have quoted him the questions. The problem was, it seems to me, that they didn't want to quote in that regard and they suffer for it." Record, Volume I at 102–03. The court posed the following hypothetical: "Suppose you had told your mother that the bench is brown rather

a different version of the literal truth defense: his response to the question was true because he told those at the meeting that the money was passed on to "six families," not to the Migliaccios and the Capuanos.

## II

The United States Supreme Court, in *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), addressed the "narrow but important question [of] whether a witness may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." *Id.* at 352–53, 93 S.Ct. at 597. Bronston had given the following set of responses under oath:

Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?

A. No, sir.

Q. Have you ever?

A. The company had an account there for about six months, in Zurich.

Q. Have you any nominees who have bank accounts in Swiss banks?

A. No, sir.

Q. Have you ever?

A. No, sir.

*Id.* at 354, 93 S.Ct. at 598. Everything Bronston actually stated was true; it was also true, however, that Bronston once had a Swiss bank account. Nonetheless, the Court held that he could not be convicted of perjury for *implying* an untruthful answer under oath when everything he stated was, in fact, literally true.

The Court offered several sound reasons for this strict rule. It noted that our adversary system relies heavily on witnesses testifying freely and without fear of retribution from the legal establishment. The Court feared that, if a jury were permitted to conjecture whether a true but unresponsive answer was intended to mislead, "[w]itnesses would be unsure of the extent

of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of 'intent to mislead' or 'perjury by implication.'" *Id.* at 359, 93 S.Ct. at 600. Even the most honest and well-intentioned witnesses, the Court stated, may occasionally give an unresponsive answer due to a misunderstanding of the meaning or scope of the question. *Id.* at 358, 93 S.Ct. at 600. The Court reasoned, then, that a perjury prosecution is an unnecessarily "drastic sanction ... to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert ... to the incongruity of [the witness'] unresponsive answer." *Id.* When a witness is under oath, it is the lawyer's responsibility to recognize an unresponsive answer and to steer the witness to respond directly to the intended meaning of the question. *Id.* at 358–59, 93 S.Ct. at 599. The skilled attorney, not the threat of perjury, assures that the witness understands the question and responds to it.

■ The principles underlying the *Bronston* decision also bar perjury convictions for arguably untrue answers to vague or ambiguous questions when there is insufficient evidence of how they were understood by the witness. *United States v. Eddy*, 737 F.2d 564, 567 (6th Cir.1984); *United States v. Tonelli*, 577 F.2d 194, 200 (3d Cir.1978). Simply, the jury cannot be allowed to guess at the witness' understanding of a clearly ambiguous question. "Especially in perjury cases, defendants may not be assumed into the penitentiary." *United States v. Brumley*, 560 F.2d 1268, 1277 (5th Cir.1977).

■ While superficially appealing as a defense, the "literal truth" argument is not applicable to the case before us. First, no claim is made that Glantz' statement, "Absolutely not," was true but unresponsive to the question asked before the grand jury.

than the bench was brown, what about that?" To which defense counsel replied, "I think, your honor, if my answer is literally true that I never said was brown, then in fact I have not committed perjury, and that's as a matter of law."

Record, Volume II at 376–77. At no time during trial, either before the court or the jury, did defense counsel suggest that Glantz was actually referring to "six families" rather than the Migliaccios and the Capuanos.

Unlike the defendant in *Bronston*, Glantz answered the question posed and did not simply make another statement not addressed to the question. Furthermore, no one argues that the question—"Did you ever tell anyone that that money was passed on to them?"—was vague or was open to several interpretations: appellant agrees with the government that "them" referred to the Migliaccios and the Capuanos, and that "that money" referred to Farina's $140,000 profit from the Knight Street deal. Thus, all parties agree that Glantz stated before a grand jury that he had never told anyone that the $140,000 profit received by Farina had been passed on to the Migliaccios and the Capuanos. The petit jury had to determine whether this was a lie.

The issue at trial, then, was *not* what Glantz had said to the grand jury, but whether Glantz said, at the meeting with his fellow investors and as shown by the tape recording of that meeting, that the money had been passed on to the Migliaccios and the Capuanos. The strict rules of *Bronston* and its progeny are not applicable to business meetings or other sources of unsworn utterances. Those rules arose from a recognition that, when considering the meaning of words spoken *under oath*, "we are not dealing with casual conversation." *Bronston*, 409 U.S. at 357, 93 S.Ct. at 599. However, that is precisely what the jury was dealing with in the trial below when it considered the meaning of words uttered at the meeting. At the meeting, Glantz was not being questioned by a skilled lawyer. No one at that meeting had the "responsibility to recognize [an] evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Id.* at 358–59, 93 S.Ct. at 600. Nor are we worried about stifling the free testimony of witnesses or anyone else: there can be no stifling effect since one cannot be subjected to perjury charges for lying, by implication or otherwise, at a meeting of business associates.

At the trial below, the jury was concerned with what information Glantz believed he conveyed at the meeting and whether he conveyed it. They could have properly considered what Glantz and his associates would have understood Glantz' words and actions to mean at that meeting, in light of all the past dealings and common knowledge of the parties. The jury was required to decide whether, beyond a reasonable doubt, Glantz was aware that he had conveyed information at that meeting that the excess money from the sale of the Knight Street property had been passed on to the Migliaccios and the Capuanos. The question was sufficiency of the evidence, not "literal truth."

## III

■ When considered in this light, the record supports the jury's determination that, beyond a reasonable doubt, Glantz had told the members of the tape-recorded meeting that Farina's $140,000 profit from the sale of the Knight Street property had been passed on to the Migliaccios and the Capuanos. Indeed, we fail to see how they could have determined otherwise.

Numerous considerations support the jury's verdict. First, the tape recording shows that the participants at the meeting understood that the original sellers of the land were the Migliaccios and Capuanos. Perl stated at the meeting that the investors had obtained documentation from the bank regarding the sale. He states that "there's a memo at the bank that says we're buying it from Migliacci (sic) and Capuanos." He also asks why they bought the land from Farina and not from the Migliaccios and Capuanos. Thus, it was common knowledge among those at the meeting that the original sellers of the land were "the Migliaccios and Capuanos." Second, the tape shows that Glantz' entire explanation of the missing $140,000 was that it had been passed on to the sellers of the land for tax purposes. He says that the "money was a pass through"; that "[i]t went right back to the people ... in cash"; that "he paid them back in cash"; that the pass through "was for governmental reasons and tax reasons, tax considerations ... [b]ut they were paid $314,000 for the property"; and that "[t]he point of the

8

matter is, the illegality ... is of the Migliaccios wanting not to pay all the taxes on the land." This evidence clearly suggests that Glantz knew that (1) the other members of the meeting understood that the Migliaccios and Capuanos were the sellers of the land; (2) as the sellers, they were the only ones that could benefit from an illegal cash payment to avoid taxes; and therefore, (3) the other members of the meeting understood him to be saying that the $140,000 was passed through to the Migliaccios and Capuanos.

Glantz' alternative explanation on appeal is untenable. He now claims that he told his associates that the money was passed on to "six families," not the Migliaccios and Capuanos. He bases this argument exclusively on the following segment of the tape:

GLANTZ: Well. All right. Two things. Number one with regard to the transaction. There was a double closing of the land. A double closing on the land. And I don't know the figures, but the figures you would have in the file, whatever it was, and that was for tax considerations on the property. (Unintelligible) six families involved ... in fact, where there were more than six people, but there was other families involved. As to what they bought the land for, and it went through, that stays here. So you know.

PERL: Yeah.

GLANTZ: That's for ... that's, that was for governmental reasons and tax reasons, tax considerations. But they were paid $314,000 for the property. Okay?

At no other time during the meeting did he mention "six families." On the contrary, later in the meeting, as noted above, he specifically stated that the reason for the pass through was "the Migliaccios wanting not to pay all the taxes on the land."

Most importantly, however, Glantz never argued at trial that he told his associates that the money had been passed on to "six families" and not the Migliaccios and Capuanos. Without such an argument, we fail to see how the jury, *sua sponte*, could

have concluded that this was what he actually intended to tell the other members of the meeting or that that was what the others should have understood from his words. His failure to make that argument suggests that, at the time of his trial, even he did not believe this explanation of his words. If he did not believe this explanation, neither could the jury have believed it. Neither do we.

## IV

Glantz also claims that the district court's instructions to the jury denied him a fair trial. He argues that the district court erred because (1) it did not give a "literal truth" instruction which adequately represented his theory on this defense; (2) it gave an inadequate instruction regarding unanimity of verdict on Count Two; (3) it sent excerpts of the transcript of his grand jury testimony to the jury room even though the transcript had not been introduced into evidence; (4) it instructed the jury that it had found the allegedly perjurious statements to be material; (5) it did not adequately instruct the jury that the underlying land transaction was irrelevant to their deliberations; (6) it did not give an adequate bias and interest charge; and (7) it gave an inappropriate instruction on reasonable doubt.

The following is the instruction the court gave regarding literal truth:

A statement is not false merely because it is misleading or evasive, even if it was deliberately intended to mislead or evade the person asking the question. A statement is false only if it is literally untrue. However, in determining whether an answer to a question is literally untrue, you should consider the context of the questioning as a whole, and the context in which the questions and answers occurred, as an aid to understanding the defendant's intent when making the statement. Unless you find beyond a reasonable doubt that a statement is literally untrue, you must acquit the defendant even if you find that the state-

ment was deliberately misleading or evasive.

\* \* \* \* \* \*

As to Count Three, the theory of the defense is that the defendant gave an answer which is literally true, even though it may have been misleading or evasive. If the Government fails to prove that defendant's answers were literally untrue, then you must return a verdict of not guilty on Count Three. Appellant claims that the court was in error to tell the jury that it should consider the context of the questions and answers as an aid in understanding the "intent" of the defendant when he made his allegedly perjurious statement.[3]

We agree that the intent of the accused perjuror generally is irrelevant except to the extent that it demonstrates whether or not he actually believed his statement to be true. *Bronston*, 409 U.S. at 359, 93 S.Ct. at 600. It is not clear to us, then, why the challenged instruction was included in the charge, unless it was meant to refer to the defendant's belief in the truth of his grand jury statements. Regardless, in the context of the entire charge, the instruction caused no harm. Any incorrect implications from the challenged instruction were corrected when the court specifically stated that a literally true statement is not false merely because the speaker "deliberately intended to mislead or evade...." The court provided further clarification when it directed the jury to acquit the defendant "even if you find that the statement was deliberately misleading or evasive." Considered in its entirety, therefore, the instruction clearly conveyed that the intent of the defendant at the time he made the statement, in the sense of wanting to mislead, evade, or not cooperate, is irrelevant if the statement was literally true. No further instruction is required by *Bronston* on the issue of "intent."

■ Glantz' next claim of error concerns Count Two of the indictment, charging him with making two separate false state-

ments. Although the court told the jury that each alleged violation must be considered separately, that Count Two contained two alleged false statements, and that their verdict must be unanimous, appellant argues that the court erred by not telling the jury that, to find the defendant guilty on this count, they must be unanimous regarding one specific statement.

Ironically, the only two cases on point cited by Glantz are cases which uphold the jury instructions given despite the fact that they did not include the exact instruction the appellant claims was erroneously excluded in the trial below. In *United States v. Kehoe*, 562 F.2d 65, 69 (1st Cir.1977), this court, while refusing to reach the specific issue of whether the court should have included the same instruction requested by appellant in this case, nonetheless held that "[t]he court was correct in instructing that the Government satisfied its burden of proof so long as it proved beyond a reasonable doubt that [the defendant] knowingly answered at least one of the questions falsely." In *Vitello v. United States*, 425 F.2d 416, 419 (9th Cir.1970), the court accepted, *arguendo*, the appellant's argument that a reversal is required if the trial court's instructions would not lead a jury to conclude that it must unanimously agree as to guilt regarding one or more of the specified acts of alleged perjury. It then listed the various specific instructions which constituted the charge to the jury on the issue of perjury. These were virtually identical to those presented to the jury in the trial below, including directives that each alleged violation and evidence relating to it must be considered separately, that the count under consideration contained more than one allegation of alleged perjury, that the government had to prove the defendant made one or more false statements, that they must be convinced beyond a reasonable doubt as to each element of the offense, that their verdict must be unanimous, and that they were to consider the instructions as a whole and not single

---

3. Glantz also complains because the court did not include the instruction, "Nor is a statement false that implies but does not state a fact which the person making the statement knows to be untrue." This statement would have added nothing to the instructions actually given.

**10**

out any particular instruction. *Id.* at 422. The court concluded, as do we, that these comprehensive instructions could only be interpreted by the jury to mean that the defendant must be acquitted on the count unless the entire jury believed beyond a reasonable doubt that the appellant was guilty of one specific act of perjury alleged in that count.

■ Appellant next argues that the court erred by including in the jury charge excerpts of the grand jury testimony which were also contained in the indictment. Although the same excerpts had been read to the jury without objection, the *transcript* of the grand jury testimony was never admitted into evidence. Glantz complains that the jury was never told that the excerpts merely tracked the indictment, which was not evidence, nor that their own recollection of oral testimony should control over anything in the written jury instructions. He argues that this procedure effectively removed from the jury the question of whether he actually made the allegedly perjurious statements before the grand jury.

It has been the "well nigh universal rule," and it is now the rule in this circuit, that whether an indictment is given to the jury for use in their deliberations is within the discretion of the trial court if it provides proper covering instructions. *See United States v. Medina,* 761 F.2d 12, 21–22 (1st Cir.1985) and cases cited therein. The court in this case decided not to include the entire indictment with the charge because such a procedure would be incurably prejudicial. At the same time, it was concerned that without some portions of the grand jury transcript which were reproduced in the indictment, the jury would have difficulty understanding the issues in the case. The court appears to have been motivated, at least in part, by the defense theory that Glantz never spoke the precise phrase that was the basis for his allegedly false negative reply charged in Count Three.

We see no error in the court's method of resolving this matter and believe that it is consistent with the rule expressed in *Medi-*

*na.* That rule explicitly relies on the discretion of the trial judge to determine, under the circumstances of the particular case, whether the benefits of providing the indictment to the jury outweigh any potential prejudicial effects. The rule is not an all or nothing alternative: in his or her discretion, the judge may determine that the most just approach is to expose the jury to only certain portions of the indictment. An efficient vehicle for reaching this goal is to read those portions into the jury charge, which the jury may take to its deliberations. We will find no fault with the exercise of the court's discretion in this manner unless the defendant can show unfair prejudice as a result of the court's approach.

Whether all or a part of the indictment is provided to the jury, one way to avoid unfair prejudice is to give a proper covering instruction. The court below provided such an instruction in two ways. First, when it read the grand jury excerpt from the indictment, it prefaced that reading with the comment that the government charge "is based on the [Government's] *contention* that the defendant falsely answered ... in his testimony as follows...." Second, the court gave the following cautionary instruction regarding the effect of the indictment:

You must understand the effect of an indictment. It is only an accusation. The fact that it has been brought is totally meaningless so far as your tasks are concerned. It may not be the basis of any suggestion of guilt. All that it does is to bring this matter before you for your determination. Beyond that, it has no significance whatever from the point of view of guilt or innocence. It merely sets forth the elements of the offenses which must be proved beyond a reasonable doubt by the United States. It is in fact, and effect, a formality, and its existence has nothing to do with your decision.

We believe these instructions adequately provided a guard against the jury using the excerpted grand jury transcript as actual evidence. Furthermore, even if the jury

had, the defendant could have suffered little prejudice since the same grand jury testimony had already been introduced into evidence orally and without any claim that it was in any way erroneous.

■ Glantz next finds fault with the court's instruction to the jury that "[t]he court has determined that the declarations alleged to have been made by the defendant are material." He claims this instruction prejudiced his case because the average lay juror would understand this to mean that the court had already found the statements to be "essentially false or significantly misleading." Appellant does not contest the well-settled rule that the issue of materiality is a matter for the court to decide (*see, e.g., Sinclair v. United States,* 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929) and *United States v. Collatos,* 798 F.2d 18, 19 (1st Cir.1986)), but argues only that the instruction should not have been given.

We disagree. The challenged statement was made directly after the court had quoted from the federal perjury statute under which Glantz had been charged, 18 U.S.C. § 1623:

Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... knowing the same to contain any false material declaration [shall be guilty of an offense against the United States].

The statute thus states twice that a necessary element of the crime is that the false statement be material. The jury needed to know that it need not waste its time considering the question of materiality and that it should not base its decision on this issue. The most straightforward way to inform the jury of this fact was to simply tell them. Confining the explanation to one simple sentence out of a twenty-six page charge accomplished the goal without needlessly magnifying the issue.

No injustice results from dealing rather summarily with appellant's final three claims of error. First, as to evidence of the underlying land transaction, the jury was specifically told: "You must consider only these three charges [contained in the indictment] in determining the defendant's guilt or innocence. You need not consider whether the original Knight Street transaction was illegal in any way." No further directive was necessary to inform the jury that considerations of the legality of the underlying land transaction should not influence their deliberations. Second, regarding the bias and interest instruction, the jury was told that grants of immunity and previous criminal convictions should influence its assessment of the credibility of a witness' testimony. The court gave very emphatic instructions that the testimony of immunized witnesses or those that have committed prior acts of perjury should be examined with the greatest of care, with particular consideration given to whether the testimony was affected by personal interest, prejudice, or antagonism toward the defendant. In light of these instructions, the court committed no error by failing to specifically warn the jury that it should also consider the relative credibility of a witness (*i.e.,* Farina) who had agreed to cooperate with the government in the Glantz case in exchange for a plea bargain in an unrelated case.

■ Finally, we do not find that the instruction given on reasonable doubt undermines that standard. Although it did, perhaps, dwell slightly too much on what was not rather than what was, a reasonable doubt, the charge to the jury as a whole did not remove the government's heavy burden of proof. *See Bumpus v. Gunter,* 635 F.2d 907 (1st Cir.1980). We do agree that the statement by the court that a reasonable doubt "is not a doubt suggested by the ingenuity of counsel," provides an incorrect inference: all defenses rely to a great extent on the "ingenuity of counsel." However, as in *United States v. Glenn,* 828 F.2d 855, 861 (1st Cir.1987), where nearly the identical statement was challenged, we do not believe the jury could have been misled in light of other extensive and correct instructions regarding the burden of proof and presumption of innocence. We add, however, that the use of this

**12**

phrase in the future may well result in a mistrial. We hope it will be eschewed.

*Affirmed.*