# United States Court of Appeals
## For the First Circuit

No. 06-1779

UNITED STATES OF AMERICA,

Appellee,

v.

CLIVE MCFARLANE, a/k/a CLIVE MCFARLAND,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Circuit Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

Roger Witkin for appellant.
Paul R. Moore, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, and Cynthia A. Young,
Assistant United States Attorney, were on brief, for appellee.

July 12, 2007

**HOWARD**, **Circuit Judge**.  Clive McFarlane was convicted of one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1) and was sentenced to 180 months of imprisonment.  McFarlane appeals, claiming that the district court erroneously denied his motion to suppress and committed several trial errors.  We affirm.

## I.

The government presented the following evidence at trial. Just before 7 p.m. on April 25, 2005, David Delehoy, a detective with the Brockton, Massachusetts Police Department, was traveling through a high-crime section of Brockton on his way to work.  While stopped at a traffic light, Detective Delehoy, who was dressed in plain clothes and driving an unmarked car, saw a group of people standing in an abandoned parking lot and heard three loud explosions, which he thought were gun shots.

Detective Delehoy turned in the direction from which he thought the gun shots originated and saw a man sprinting away from the group in the parking lot.  He followed the man, later identified as Antwone Moore, before losing sight of him behind several buildings.  After a few seconds, Delehoy again spotted Moore, this time walking rapidly.  At the same time, Delehoy also saw a second male, later identified as Clive McFarlane, following approximately 100 feet behind Moore.

-2-

Delehoy observed Moore looking repeatedly over his shoulder at McFarlane. Soon, Moore began running across another vacant lot. Delehoy sped ahead, stopped his car at the end of the lot, and asked Moore if he needed help or a ride. Delehoy left his car, identified himself as a police officer, showed his badge to Moore, and ordered him to show his hands. Moore, who appeared relieved by Delehoy's presence, said that McFarlane was trying to shoot him.

Delehoy then saw McFarlane approach a set of trash cans along the path Moore had traveled. Delehoy, who had an unobstructed view of McFarlane, saw him remove a liner from the trash can, lean into the can with both arms, and stand up to replace the liner. This led Delehoy to believe that McFarlane might have put something in the can. Delehoy, with his gun drawn and badge displayed, moved toward McFarlane and ordered him to raise his hands and get down on the ground. McFarlane shouted profanity at Delehoy but complied with the order. Delehoy called for help and remained several feet from McFarlane until another officer arrived.

Seconds later, Officer Robert Smith arrived on the scene and, at Delehoy's command, handcuffed McFarlane. After McFarlane was handcuffed, Delehoy went to the trash can into which McFarlane had reached. He removed the liner and found a revolver containing six spent ammunition cases.

At trial, McFarlane testified in his own defense. He stated that he and Moore had a physical altercation in the abandoned parking lot, during which Moore attempted to shoot him with the revolver that was later found in the trash can. McFarlane explained that Moore then fled, but McFarlane followed, stopping to look in the trash can out of curiosity.

## II.

### A.    Motion to Suppress

Prior to trial, McFarlane filed a motion to suppress, claiming that his detention and arrest violated the Fourth Amendment to the Constitution because there was neither probable cause for the arrest nor reasonable suspicion for the detention. After an evidentiary hearing,[1] the district court denied the motion, concluding that there was reasonable suspicion to detain McFarlane for an investigative stop under Terry v. Ohio, 389 U.S. 950 (1967), and that Delehoy permissibly ordered McFarlane to the ground because he may have been dangerous.

In considering the denial of a motion to suppress, we review  questions of law de novo and factual findings for clear error, see United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006), and will affirm the district court's decision if any reasonable view of the evidence supports it, see United States v.

---

[1]The evidence presented at the hearing was identical in all material respects to the trial evidence described earlier.

Garcia, 983 F.2d 1160, 1167 (1st Cir. 1993). In resolving McFarlane's challenge, we bypass the district court's Terry stop analysis because we conclude, in accord with the government's alternative position, that Delehoy had probable cause to arrest McFarlane at the moment he ordered him to the ground.[2]

An arrest does not contravene the Fourth Amendment's prohibition on unreasonable seizures so long as the arrest is supported by probable cause. See United States v. Fiasconaro, 315 F.3d 28, 35 (1st Cir. 2002). "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect committed or was committing a crime." United States v. Burhoe, 409 F.3d 5, 10 (1st Cir. 2005). The inquiry into probable cause to support an arrest focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. See United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005).

McFarlane contends that there was no basis for his arrest when Delehoy ordered him to the ground because at that point the only information available to Delehoy was Moore's uncorroborated statement that McFarlane had tried to shoot him. We disagree.

---

[2]In resolving McFarlane's challenge on the basis of probable cause, we do not mean to imply that the district court's analysis was incorrect but only that probable cause provides a more straightforward ground for affirmance.

When Delehoy made the arrest, he had substantially more information than Moore's word that a crime had taken place. Before the arrest, Delehoy heard several gun shots from a close distance and then observed McFarlane following Moore in what appeared to be a chase.  He saw Moore sprinting away from McFarlane and looking back over his shoulder several times to check on McFarlane's distance.  He also saw what he thought was McFarlane's attempt to hide an object in a trash can by removing a liner, placing both hands in the can, and then replacing the liner.  See United States v. Meade, 110 F.3d 190, 198-99 (1st Cir. 1997) (noting that suspicious maneuvers are relevant to the probable cause inquiry).

After watching the chase, Delehoy stopped Moore and identified himself as a police officer.  Moore appeared relieved by the presence of a police officer and informed Delehoy that McFarlane had tried to shoot him.

A statement from a source can constitute the basis for probable cause, even if the source is previously unknown to the officer, so long as there is a sufficient basis for crediting the source's reliability.  See Vongkaysone, 434 F.3d at 71.  Here, there was a sufficient basis for Delehoy to credit Moore's statement.  Moore made the statement to Delehoy face-to-face, which supports the statement's reliability because the face-to-face nature of the encounter permitted Delehoy to observe Moore's apparent relief when he realized that a police officer was present.

-6-

This conduct was consistent with Moore's claim that someone was trying to shoot him. See United States v. Romain, 393 F.3d 63, 73 (1st Cir. 2004) ("A face-to-face encounter provides police officers the opportunity to perceive and evaluate personally an informant's mannerisms, expressions and tone of voice and, thus, to assess the informant's veracity more readily . . . ."). The nature of the encounter also allowed Delehoy to learn Moore's identity and appearance so he could hold him responsible if the information provided later turned out to be false. See Florida v. J.L., 529 U.S. 266, 270-71 (2000). Furthermore, after Moore made the statement, Delehoy saw McFarlane appear to hide something in the trash can, which was consistent with Moore's assertion that McFarlane had tried to shoot him. See United States v. Greenburg, 410 F.3d 63, 68 (1st Cir. 2005) (stating that an officer's observation of conduct consistent with the informant's tip supports the tip's veracity).

In sum, Delehoy saw a chase between two men after hearing gun shots and then learned from one participant of the chase that the other had tried to shoot him. The circumstances under which Moore made this statement to Delehoy supported its veracity, as did McFarlane's peculiar conduct in going to the trash can. "[P]robable cause is a 'common sense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal

technicians, act.'" United States v. Meade, 110 F.3d 190, 198 n.11 (1st Cir. 1997) (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996) (alterations in original; internal quotation marks and additional citation omitted)). Under this standard, we conclude that Delehoy had probable cause to arrest McFarlane after he saw him go into the trash can. The motion to suppress was correctly denied.

### B.     Jury Instructions

McFarlane also challenges two aspects of the district court's jury instructions. First, he claims that the court did not adequately explain the concept of constructive possession as applied to this case, and second, he challenges the district court's instruction concerning the significance of his indictment in the jury deliberations.

We discern no abuse of discretion in the form of the constructive possession instruction. After determining that the facts could permit a guilty verdict under either an actual or constructive possession theory, the district court provided the following instruction concerning constructive possession:

> [C]onstructive possession means power -- the power and intention at any given time to exercise control or dominion of the object. Let me give you an example. If my son asks me to take his car to the repair shop, I'm driving it to the repair place. I have actual possession of the car. I get there, I turn the car over to the repair people. At that point, they have actual possession of the car. I have constructive possession. I intend that they do

-8-

certain things with the car, and I have the ability to take it away if I want to. So that is called constructive possession. The repair people have actual possession until such time as they're done with the car and I pick it up again.

* * *

Now, understand that ownership is not required with respect to possession. So that's why I carefully told you I was taking my son's car. He's the owner. I have possession while I take it there. Once I give it to the repair people, they have actual possession. I have constructive possession. So ownership is wholly irrelevant to this. Now, possession, where it's actual or constructive, does not have to be continuous, nor does it have to be for any particular length of time, even a short period is enough.

McFarlane objected to the constructive possession instruction, asserting that it improperly permitted the jury to convict on a constructive possession theory, even if the jury believed his testimony that he merely found the gun in the trash can. The court overruled the objection.

During deliberations, the jury submitted two questions to the district court concerning constructive possession. The jury asked (1) "Does looking for the gun constitute <u>intent</u> to exercise control and dominion over the gun?" and (2) "Does opening the trash bag, with the intent to find the gun, which is indeed there, constitute putting himself in the position to have the <u>power</u> to exercise control and dominion over the gun?" After a discussion with counsel, the court determined that providing specific answers to these questions would be inappropriate because the answers could

-9-

be interpreted by the jury as providing the court's view as to what the evidence demonstrated. Instead, the court provided the following, more general, supplemental instruction:

> The very short answer to that is that it is for you to decide each of these questions. As I told you, possession requires, and you clearly understand this, both the ability and intention to take physical control of an object. You are asking me to decide whether a particular act by itself constitutes intent to exercise control and whether . . . doing something with that intent then puts the defendant in the position of having the power to exercise control.
>
> * * *
>
> And all I can tell you is that you need to look at all of the evidence of what occurred. You need to look -- particularly with respect to intent -- you need to look at everything the defendant did, at everything he said, and the circumstances that existed at the time that he acted and spoke and decide from all of that whether he had the intent at a particular point in time that you're considering to exercise control over the object.
>
> * * *
>
> And similarly, with respect to his ability, his power to exercise control, you need to look at the whole thing and then you need to decide. I can't [tell you] whether he did indeed have the power to exercise control. You need to look at all the facts that existed at the particular moment in time and decide that question.

McFarlane asserts that this instruction was erroneous and prejudicial because it did not describe to the jury the way in which the definition of constructive possession related to the specific facts of this case. In particular, in light of his

contention that he just happened upon the ammunition when looking into the trash can (and his view that the jury questions at least suggested that they accepted this theory), he argues that the district court should have instructed that "mere curiosity . . . coupled with a direct look at the gun that held the subject ammunition, does not establish constructive possession of the ammunition."

Because this challenge concerns the form and wording of the instructions, we review them for abuse of discretion. See United States v. Tom, 330 F.3d 83, 91 (1st Cir. 2003). In formulating jury instructions, a district court is not required "to parrot the language proffered by the parties." United States v. Glaum, 356 F.3d 169, 178 (1st Cir. 2004). Within wide margins, the district court maintains discretion in the precise manner that it explains legal concepts to the jury. Id. We consider only "whether, taken as a whole, the court's instructions fairly and adequately submitted the issues in the case to the jury." Tom, 330 F.3d at 91.

The constructive possession instruction accurately described the elements required for a conviction under this theory. As they indicated, a conviction for constructive possession requires proof that a "person knowingly has the power and intention at a given time to exercise dominion over an object . . . ." United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006). The

district court also provided a cogent, everyday example of constructive possession to aid the jury's understanding. The court decided, however, not to apply the definition of constructive possession to the facts of the case for fear that such an instruction would interfere with the jury's fact finding role.

This fear was warranted. "[T]hough a trial court is permitted to marshal the evidence for the jury and, if it chooses, to comment on it, the court is not permitted to impose its own opinions on the jury or present its own theories when they are not strongly grounded in the evidence." Ostrowiski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 185 (2d Cir. 1992). Here, the main dispute at trial was over McFarlane's intent in going into the trash can. The court was properly concerned that describing various versions of the facts (and the intentions that might be inferred from them), and then instructing whether a conviction for constructive possession was warranted under each particular version, would intrude on the jury's function to find the facts and draw the inferences from them. Under these circumstances, the district court's concern was reasonable. The court therefore did not abuse its discretion by rejecting the more specific instructions sought by McFarlane.

McFarlane's second challenge to the jury instructions concerns the instruction on the appropriate use of the indictment. The court told the jury:

Now, the only other thing I want to mention is that you will have with you in the jury room a copy of the indictment. Understand, again, that the indictment is nothing more than the accusation. It is the document that contains the accusation. It is not evidence of guilt, it is not proof of guilt. It is simply the accusation, and you should not use it in determining whether the government has proven him guilty or not.

* * *

It is a judgment by an earlier, larger jury that there's probable cause to believe the witness -- that the defendant did this, but it is not evidence of guilt, it is not proof of guilt. Indeed, the defendant is, under the Constitution and laws of this country, entitled to what we call the presumption of innocence. But effectively, that means that he is innocent until the government proves him guilty beyond a reasonable doubt. And because he is innocent, he doesn't have to prove his innocence. (Emphasis added.)

McFarlane claims that the statement that a larger jury (i.e., the grand jury) had heard the matter and concluded that there was probable cause to believe that he had committed the crime was prejudicial because it misled the petit jury into believing that the case already had been resolved against him. McFarlane did not object to this instruction before the district court, however, and therefore we review it for plain error only. See United States v. Gonzales-Velez, 466 F.3d 27, 34-35 (1st Cir. 2006).

Under plain error review, the defendant must show a clear error that affected his substantial rights and undermined the integrity, fairness or public reputation of the judicial

-13-

proceedings. See United States v. Antonakopoulos, 399 F.3d 68, 77 (1st Cir. 2005). McFarlane does not prevail under this "demanding standard." United States v. Colon Osorio, 360 F.3d 48, 51 (1st Cir. 2004).

It is long settled in this circuit that "subject to a proper covering instruction, whether the indictment should be given to the jury for use during its deliberations is within the discretion of the trial court." United States v. Medina, 761 F.2d 12, 21-22 (1st Cir. 1985). The district court's statement that a "larger jury" had found probable cause, if considered in isolation, could mislead a petit jury into according significance to the grand jury's action. But we do not review jury instructions in isolation; we review the charge as a whole. See United States v. DeMasi, 40 F.3d 1306, 1317 (1st Cir. 1994). The charge read in its entirety made it clear that the indictment was not evidence of guilt. The court instructed the jury that the indictment was only an accusation that could not be used as proof of guilt and that the defendant enjoyed a presumption of innocence at all times. Indeed, the instruction given here is similar to a covering instruction that we approved as adequate to guard against the jury's using the indictment as evidence. See United States v. Glantz, 847 F.2d 1, 10-11 (1st Cir. 1988).[3] There was no plain error.

_____

[3]The instruction in Glantz stated:

You must understand the effect of an

-14-

### C. The "A/K/A" Portion of the Indictment

Finally, McFarlane claims that the indictment submitted to the jury was prejudicial because it included an alias. The indictment charged "Clive McFarlane, a/k/a Clive McFarland." McFarlane claims that it was prejudicial error for the alias not to be removed from the indictment before it was submitted to the jury. He asserts that the alias had nothing to do with the case and therefore it prejudiced the jury's deliberation to learn of the alias. McFarlane did not preserve this objection below, and thus our review is again limited to plain error.

Where the use of an alias is important to the government's case, its submission to the jury as part of the indictment is permissible. See United States v. Candelaria-Silva, 166 F.3d 19, 33 (1st Cir. 1999). But this practice has been discouraged where the alias is irrelevant. E.g., United States v. Wilkerson, 456 F.2d 57, 59 (6th Cir. 1972). Even assuming that allowing the indictment to go to the jury without redacting the alias was plain error, McFarlane has not demonstrated that the

_____

> indictment. It is only an accusation. The fact that it has been brought is totally meaningless so far as your task is concerned. It may not be the basis of any suggestion of guilt. All that it does is to bring this matter before you for your determination. Beyond that, it has no significance whatever from the point of view of guilt or innocence.

Id.

error affected his substantial rights. The indictment was not referenced by the government during the trial or by the court in its instructions. Indeed, at no point was the alias brought to the jury's attention. See People v. Romero, 694 P.2d 1256, 1268 (Col. 1985) (finding no plain error under similar facts). In these circumstances, it would be pure speculation to conclude that the listing of the alias in the indictment had any effect on deliberations. Such speculation is insufficient to ground a successful claim that a clear error affected the defendant's substantial rights. See generally Anontakopoulos, 399 F.3d at 78 (observing that, even under the most permissive articulation of the plain error standard by the Supreme Court, the defendant must show a "reasonable probability" that the error affected the outcome of the district court proceeding in order to demonstrate an effect on substantial rights).

## III.

For the reasons stated, McFarlane's conviction is **affirmed**.

-16-