# United States Court of Appeals
## For the First Circuit

---

No. 12-2304

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN DOE, a/k/a RASHIDE CAMPBELL,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Singal, U.S. District Judge]

---

Before

Torruella, Selya, and Thompson,
Circuit Judges.

---

Clifford B. Strike and Strike, Goodwin & O'Brien, on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, and Thomas E. Delahanty II, United States Attorney, on brief, for appellee.

---

December 20, 2013

---

**THOMPSON, Circuit Judge**.  Our John Doe is a man of many names.  Although there are more, we concern ourselves with only the following:  "Tony"; "G"; "Theotis Leonard"; and "Rashide Campbell."  A jury in Portland, Maine, convicted "Rashide Campbell" of illegally distributing a substance containing cocaine base.[1]  The district court sentenced him to twenty years behind bars, the maximum jail term allowed by statute.  Campbell now raises several claims of error with respect to his conviction and the length of his sentence.  Finding no error, we affirm.

### BACKGROUND

We recite the facts as the jury could have found them.  Paul Buchanan is an experienced Drug Enforcement Administration ("DEA") agent working in Portland, Maine.  Buchanan has gone undercover on many occasions where, as he described it, "you pose as someone other than yourself in order to infiltrate drug distribution organizations."  As a DEA agent, Buchanan is familiar with sales of cocaine base--also known as "crack"--in the Portland area.  Crack, he explained, is brought to Maine from other states, including New York, Connecticut, and Massachusetts, then broken up into smaller quantities for sale to local drug users.

---

[1] Doe's counsel signed the brief to this Court on behalf of "Mr. Campbell."  As Doe has apparently settled on this name, we refer to him primarily as Campbell but do not hesitate to use his other appellations, as necessary.

Buchanan came to know Campbell through the course of his undercover work, although Campbell used the name "Tony" with Buchanan. Buchanan himself used a false name when dealing with Campbell, posing as "Josh," an individual "who wants to buy drugs from Tony not just for use, but for distribution [to others] so [he] can make some money."[2] Before August 2011, Buchanan knew Tony's voice because they had spoken on the phone and met in person. At these previous "meetings," Buchanan "obtained what [he] believed to be cocaine base" from Tony.

The particular drug transaction culminating in Campbell's arrest had its genesis on August 17, 2011, when Buchanan called Tony to discuss another purchase of crack cocaine.[3] After inquiring whether Tony was "still working" ("still selling drugs" according to Buchanan), Buchanan said he "wanted to get . . . a little more than I did [last time]" and asked, "[c]an we do a little more" in the coming days. Apparently to make sure there was no confusion, Tony inquired "you telling me you're looking for something bigger?" and Buchanan confirmed he was looking to "get a whole, the whole onion." By asking for an "onion," Buchanan explained at trial, he was signaling to Tony that he wanted to buy "a whole ounce of crack cocaine, which is approximately 28 grams."

---

[2] We, however, will refer to him only as Buchanan.

[3] Unbeknownst to Tony, the DEA recorded this conversation and others.

Drug dealers, Buchanan told the jury, "very rarely . . . call crack cocaine crack cocaine" but instead use "street lingo . . . to avoid detection by law enforcement and . . . describe to the customer what their product is." During the course of their conversation, Tony indicated he would be in the Portland area on Monday and Buchanan agreed to call him then.

As agreed, Tony and Buchanan spoke again by phone the following Monday, August 22, 2011. During the first of two recorded telephone conversations that day, Tony told Buchanan he would be there that evening, and Buchanan indicated he had "fifteen," meaning "$1,500 to spend." Each assured the other he was not working for law enforcement by representing "everything is straight" or "good," and they agreed to speak again later that day to confirm the sale.

When Buchanan called back, Tony told Buchanan that he was going to leave "it" (i.e., the drugs) with one of his girlfriends, and that Buchanan would have to meet with her to make the pickup. Tony promised Buchanan "she's straight," and when Buchanan--who had not met Tony's "girlfriend" before--expressed reluctance at "dealing with someone new," Tony said he wanted to do the sale and delivery this way "just this one time." Tony then informed Buchanan he was "gonna give you [Buchanan] um [sic] fifteen for that. Straight up. And you know it's gonna be official." Buchanan understood Tony to mean, "I'm not going to rip you off,"

and he expected to get fifteen grams of crack cocaine in exchange for $1,500. Tony implored Buchanan to "please do me this one favor this one time and then we can get back to regular," explaining "I just want to be careful this one time."

Despite his just-expressed reservations, Tony apparently changed his mind about not meeting Buchanan himself, as he later told Buchanan to meet him at a Kentucky Fried Chicken in Portland. Buchanan--wearing a wire--arrived as instructed, accompanied by a surveillance team to watch and listen as the deal went down. Tony directed Buchanan to a nearby apartment, where Buchanan met Tony along with two women and, after some negotiation, bought crack cocaine for $1,400. Tony personally handed the drugs to Buchanan.

During the transaction, Tony told Buchanan he had arrived later than expected because he "didn't have enough, but I was trying to hook you up right." Tony explained further:

> . . . somebody was hookin' me up, so I wanted you to come back so I wanted to take care of you. . . . I wanted to really hook you up to make sure you come back to me. Know what I'm saying?

Buchanan then left the apartment and turned the drugs over to another DEA agent. A forensic chemist confirmed the substance Buchanan bought from Tony was in fact 6.9 grams of crack cocaine.

The jury returned a guilty verdict, and Campbell was ultimately sentenced to twenty years' imprisonment. This appeal

followed.    We incorporate additional facts below, setting forth those germane to each issue as necessary.

## DISCUSSION

Campbell believes he deserves a new trial or, at the very least, a reduced sentence, because of three purported errors affecting his trial and sentencing.  Campbell first complains-- apparently, as it is by no means clear from his brief--that the jury was allowed to learn of his use of aliases because the trial judge refused to amend the superseding indictment before trial, denied his oral motion to dismiss that indictment, and allowed the introduction of his aliases at trial.  Campbell believes this induced the jury "to infer prejudicial information" about him and could have led them to convict him upon considerations other than the evidence at trial.  Second, he claims that the trial judge erred by allowing evidence of previous, uncharged drug deals between Campbell and Buchanan to be presented to the jury, which violated the rule against "propensity evidence" and was unfairly prejudicial to him.  Finally, even if his conviction is upheld Campbell seeks a new sentence because, his argument goes, the trial judge made erroneous findings of fact at the sentencing hearing, which resulted in the imposition of a longer sentence.  We discuss these contentions seriatim, but before we can address the merits of each, such as they are, we must recount the twists and turns of the relevant pretrial and trial proceedings.

## A. Alias Arguments

From the time of his arrest through the beginning of trial, Campbell's identity was hotly contested. When he was arrested on August 22, 2011, a driver's license issued to Theotis Leonard was in his pocket.[4] He assumed this identity through booking and continued to use this name for some time in statements to law enforcement. However, when the police ran "Theotis Leonard's" fingerprints, they came back as belonging to Rashide Campbell instead.

Unsurprisingly then, the initial August 23, 2011, indictment read "United States of America v. Rashide Campbell a/k/a Theotis Leonard." Campbell persisted in his refusal to identify himself. Indeed, his November 1, 2011, trial brief states "[t]here is also an issue of Defendant's identity, which to date has not been established by the Government." At a November 29, 2011, pretrial hearing that included discussions of Campbell's identity, the prosecutor told the trial judge that Campbell "refused to identify himself in the initial appearance on the first indictment." Further complicating the matter, the prosecutor informed the court that "the real Theotis Leonard was arrested in Waterville two weeks after this guy [Campbell] was incarcerated."

---

[4] This was never brought to the jury's attention pursuant to the trial judge's pretrial ruling that evidence of Campbell's attempts to conceal his identity or of his flight was not admissible at trial. The name "Theotis Leonard" was never uttered by anyone at trial.

Defense counsel did not controvert or object to any of these factual representations, but simply indicated "the only identification he has given this entire time is Theotis Leonard." Although not stated explicitly in the record, this identification confusion surely explains the October 26, 2011, superseding indictment identifying Campbell as "John Doe a/k/a Tony a/k/a Rashide Campbell a/k/a Theotis Leonard" (the "John Doe Indictment").

Jury selection took place November 7, 2011. Further illustrative of the identity issue in play is the following jury voir dire question requested by defense counsel: "The Defendant in this case is referred to as John Doe because the Government is unaware of his true identity. Would any juror be influenced by this fact relative to being able to fairly and impartially decide the evidence in this case[?]"[5] Also, the parties agree that the John Doe Indictment was read to the prospective jurors. Although we have not been provided with a transcript of the day's events, we assume that all the aliases must also have been read to the jury, as this would have been necessary to determine if anyone in the pool knew Campbell by any of the names he went by. There is no indication in the record, and Campbell does not argue, that he

_____

[5] According to the government's brief, Campbell insisted on being presented as John Doe at the jury empanelment. Campbell does not contest this assertion.

-8-

objected to the reading of the John Doe Indictment during jury selection.

The district court heard pretrial motions on November 29, 2011, the day before trial began. Towards the end of the hearing, defense counsel made an "oral motion to have this indictment amended to United States of America versus Theotis Leonard," arguing that presenting his client as John Doe to the jury would be prejudicial. After some back and forth the trial judge declined to amend the indictment. He did, however, invite the parties to agree on one name to present to the jury at trial and instructed them to make a decision by the next morning.

When they reconvened in the morning, defense counsel proposed using the name "Rashide Campbell." Defense counsel further agreed it would be appropriate to refer to Campbell as "Tony" at trial: "He is still a/k/a Tony as far as I know and I think that's legitimate in terms of this case. That's what he was calling himself." The parties ultimately memorialized their agreement in a handwritten stipulation signed by defense counsel (Attorney William Maselli), the prosecutor (Attorney Daniel J. Perry), and Campbell himself setting forth the following:

> The parties hereby stipulate:
>
> 1. The Defendant [and] Government agree the name Rashide Campbell a/k/a Tony will be used in these proceedings.
>
> 2. The Defendant and Government agree that the aliases John Doe and Theotis Leonard also

-9-

are identical identifying names as Rashide Campbell a/k/a Tony for the purposes of this case.[6]

Almost immediately after entering into this stipulation, defense counsel made "an oral motion to dismiss this case at this time based upon the Government's re-indictment under this name John Doe." Because no written motion was filed, we set forth counsel's presentation and the trial judge's ruling in their entirety:

> Mr. Maselli: But one other issue, we've been also discussing the impact of John Doe and we have maybe different views of it, but I'm making an oral motion to dismiss this case at this time based upon the Government's re-indictment under this name John Doe.
>
> Again, as I stated in the prior conference, the only reason it wasn't challenged in writing at the time the indictment came down is the Government represented to me that they had determined that he was not Rashide Campbell and I accepted that representation on face value.
>
> Now, it turns out as of yesterday, learning that there was one witness who--it was within the last couple of days, I don't remember when we first discussed it, but there is one witness who saw a photo of the defendant and said that's not Rashide Campbell. Now, the Government even has apparently grave concerns as to whether this witness is telling the truth.

---

[6] We pause here to note it would have been helpful had the government mentioned in its brief that the parties' stipulation went beyond referring to Campbell as "Rashide Campbell" at trial and permitted him to be referred to as "Tony." As this was not brought to our attention, the Court was required to comb through the trial transcripts and exhibits in order to discover this important fact.

I don't think that's a sufficient basis to change an indictment already brought before this court of Rashide Campbell, and the entire case has gone through as Rashide Campbell, to John Doe and then to place it before the jury at the last moment as John Doe and we are in a situation where --

The Court: I thought we agreed it wasn't going to be placed in front of the jury as John Doe. It was going to be placed in front of the jury as Rashide Campbell.

Mr. Maselli: I mean at the jury selection, You Honor, I apologize. So he was John Doe at the jury selection.

The Court: Well, you people should have discussed this a long time ago and dealt with this issue. Your motion to dismiss is denied. Too little too late.

Although Campbell had made an oral motion to amend the indictment to Theotis Leonard less than twenty-four hours earlier, from the tenor of this argument he now seemed to be taking the position, without reference to any authority, that the John Doe Indictment never should have issued in the first place. That the trial judge did not solicit argument from the government and made a relatively terse denial of this oral motion is hardly surprising in light of the late hour and the fact that the parties had just agreed to use the names "Rashide Campbell" or "Tony" exclusively at trial.

Yet, even this clear ruling from the court did not quiet the back and forth over Campbell's identity. The prosecutor took one last opportunity to comment:

Mr. Perry: Only other thing, Your Honor, is as Mr. Maselli states, this case was read to

the jury [at jury selection] as U.S. v. John Doe. Mr. Maselli introduced his client as John Doe. I do want to raise that to the Court in that now they're going to hear the case is U.S. v. Rashide Campbell.

The Court: They don't remember it. They're going to follow my instructions.

Following this colloquy, the trial judge marked the handwritten stipulation as Exhibit 6 for identification purposes only, reminded both parties that Campbell was only to be referred to "consistent with this agreement," and had Campbell acknowledge his signature on the stipulation.

The preliminary matters finally disposed of, the jury was brought into the courtroom and trial began. From that point forward, and contrary to what he asserts in his brief, Campbell was referred to as either "Campbell," "Tony," or as "the defendant." The names "John Doe" and "Theotis Leonard" were never mentioned at trial, nor did the prosecutor comment on Campbell's use of multiple names or suggest to the jury that the only people who use aliases are those with something to hide.

Furthermore, the John Doe Indictment marked as an exhibit at trial and provided to the jury for its use during deliberations was redacted to remove the names "John Doe," "Tony," and "Theotis Leonard," such that it identified Campbell as "Rashide Campbell" only. As promised, the trial judge instructed the jury that it was to base its verdict only upon the evidence at trial, which consisted of sworn witness testimony and the exhibits received into

-12-

evidence.  The jury was also instructed that the indictment "is no evidence whatsoever of his guilt."

**1.  Motion to Dismiss**

Having laid the groundwork, we turn our attention to Campbell's arguments.  Although Campbell's brief is by no means a model of clarity, having studied the submission we surmise that he takes issue with the denial of his day-of-trial motion to dismiss the John Doe Indictment.[7]  Campbell's argument goes something like this:  "[t]he trial court abused its discretion when it allowed the indictment to read as 'United States of America v. John Doe, a/k/a Tony a/k/a Rashide Campbell a/k/a Theotis Leonard.'"  As such, he was unfairly prejudiced by the multiple names on the John Doe Indictment because, "[a]lthough this was never directly brought to

---

[7] This must be the case, as the only other pretrial motion regarding aliases--one not raised on appeal--was his day-before-trial motion to amend the John Doe Indictment to name as the defendant, "Theotis Leonard."

Puzzlingly, Campbell also argues that the trial court abused its discretion when it refused "[t]o [a]mend [t]he Government's [i]ndictment [a]nd [i]dentify Mr. Campbell [a]s [o]nly 'Rashide Campbell.'"  The record fails to provide any factual basis whatsoever for this argument.  Such a motion was simply never made. What really happened is that, on the day before trial, defense counsel made an "oral motion to have this indictment [i.e., the John Doe Indictment] amended to United States of America versus Theotis Leonard."  After briefly hearing arguments from each side, the trial judge ruled "[t]he indictment stands as it is," but invited the parties to come to an agreement on a single name to be used at trial.  Not only did Campbell fail to object to this invitation, but the parties in fact took the judge up on it, stipulating the next morning to use the name **"Rashide Campbell**." As Campbell neither objected to this procedure at trial nor briefed it on appeal, we need concern ourselves no further with Campbell's request to amend the John Doe Indictment.

-13-

the jury's attention, it is conceivable that the jury noticed the numerous instances in which Mr. Campbell's name was changed." Then, after speculating that the jury became aware of his use of aliases, Campbell further supposes he was "unfairly prejudiced by the use of various names throughout the jury selection, the multiple indictments, and the trial."

From the tone of its brief, it appears the government is not exactly sure what Campbell is attempting to argue with respect to his aliases. Yet whatever his gripe, the government says the blame for Campbell's woes lays squarely at his own feet. Campbell, the government informs us, "insisted during pre-trial proceedings on presenting himself initially as Theotis Leonard and then to the jury as Doe." In sum, the government urges us to reject Campbell's eleventh-hour objection to a situation of his own making, as in its view doing otherwise would allow Campbell to benefit from his deliberate attempts to conceal his identity.[8]

We note first that Campbell may have forfeited any objection to the propriety of the John Doe Indictment by waiting to raise it until the first day of trial. Cf. United States v. Pérez-González, 445 F.3d 39, 44 (1st Cir. 2006) (finding the defendant forfeited objections to arrest warrant and post-arrest statements where he "wait[ed] until the first day of trial" to raise them in

---

[8] The government further argues that Campbell's aliases were "benign" at any rate, such that the jury is not likely to have been prejudiced by them.

motion to suppress); see also Fed. R. Crim. P. 12(b)(3) (requiring a motion alleging a defect in the indictment to be "raised before trial"). But, while we also doubt that defense counsel adequately placed his objection to the John Doe Indictment before the trial judge, the trial judge nevertheless proceeded to rule on the request. We too, then, will charitably deem the motion to dismiss to have been properly raised before trial and review the trial judge's decision accordingly.

When reviewing the trial court's denial of a motion to dismiss an indictment, we review questions of law de novo. United States v. Lopez-Matias, 522 F.3d 150, 153 (1st Cir. 2008). If the court makes factual findings, those findings are reviewed for clear error. Id. Its "ultimate ruling," however, is reviewed for abuse of discretion. Id. After carefully reviewing the record, we conclude that the district court neither erred as a matter of law nor abused its discretion in denying the motion to dismiss.

Although not set forth by Campbell in a particularly logical manner, the crux of his argument seems to be that the original indictment against Rashide Campbell a/k/a Theotis Leonard should never have been supplanted by the John Doe Indictment in the first place. Notably, however, Campbell has not brought to our attention, nor have we found, any authority supporting his contention that the John Doe Indictment was improperly issued. The government says the John Doe Indictment was proper because

"Campbell dubbed himself 'John Doe' and refused to admit he was Rashide Campbell as originally indicted."

It has long been the law in this Circuit that introduction of alias evidence at trial is proper where it is relevant and does not prejudice a defendant. United States v. Candelaria-Silva, 166 F.3d 19, 33 (1st Cir. 1999). Further, "'[t]he use of an alias in an indictment and in evidence is permissible if it is necessary to connect the defendants with the acts charged.'" United States v. Hines, 955 F.2d 1449, 1454 (11th Cir. 1992) (alteration in original) (quoting United States v. Jorge-Salon, 734 F.2d 789, 791-92 (11th Cir. 1984)). To that end, the admission of a defendant's alias in Candelaria-Silva--a nickname--was not error because it was probative of his identity. 166 F.3d at 33. Somewhat more recently, we reiterated that in a situation "[w]here the use of an alias is important to the government's case, its submission to the jury as part of the indictment is permissible." United States v. McFarlane, 491 F.3d 53, 61 (1st Cir. 2007). Notably, in McFarlane we affirmed the trial court where it allowed the jury to have a copy of the indictment containing an alias during its deliberations. Id. at 60-61.

Thus, as our case law makes clear, a defendant's aliases may be introduced at trial in cases where identity is at issue. Campbell himself admits, as he must, that who he actually was, was

hotly contested from the very moment he was taken into custody and up to the day of trial and beyond. Because Campbell's identity was a live issue when the grand jury returned the superseding John Doe Indictment on October 26, 2011, it necessarily follows that the Indictment setting forth all names known to have been used by Campbell was proper. Similarly, it was not error for the trial court to read the John Doe Indictment during jury empanelment when Campbell's identity was still up in the air. And, finally, had the parties not stipulated to using "Rashide Campbell" and "Tony," evidence of his aliases would unquestionably have been admissible during his trial. See Candelaria-Silva, 166 F.3d at 33 (introducing defendant's alias at trial was proper and did not prejudice the defendant where the alias was relevant to identity).

Three weeks (including Thanksgiving) elapsed between Campbell's jury selection and the start of trial. By the time the jury next laid eyes on Campbell, the parties had entered the pretrial stipulation barring the use during trial of the names "John Doe" and "Theotis Leonard." The court and the prosecutor followed through as agreed. At the close of the evidence, the copy of the indictment sent to the jury had been redacted to identify Campbell as "Rashide Campbell" only. So too did the jury verdict form, which identified the case as "United States of America v. Rashide Campbell, Defendant." Thus, the jury did not hear or see Campbell referred to as anything other than "Rashide Campbell" or

-17-

"Tony" at any point during trial.  Clearly, the trial court's limitation on the names to be used removed any possible prejudice-- and we see none--to Campbell that may have resulted from the jury hearing his multiple aliases during jury voir dire.

Having reviewed the entire record, we conclude there was no merit to Campbell's motion to dismiss.  As such, the trial judge acted well within the bounds of his discretion in denying the motion.[9]

## B. Evidence of Prior Bad Acts

Moving on, Campbell next appeals the trial court's admission, over his objection, of recorded conversations and testimony with respect to other occasions on which he sold drugs to Buchanan before August 22, 2011.  Specifically, according to Campbell, past drug transactions were not relevant to the single act of distribution with which he had been charged and therefore should not have been admitted at trial.  He also believes testimony

---

[9] Before continuing on, we pause to clean up one last matter on the issue of aliases. From the text of Campbell's brief, he persists in his assertion that evidence of his aliases was admitted at trial.  He then asserts the jury may have inferred prejudicial information about him due to his use of more than one name and he states that "although this evidence [i.e., attempts to conceal his identity] was allegedly excluded, there were various instances throughout Mr. Campbell's trial in which Mr. Campbell was referred to by another name."
The record is clear and shows beyond a shadow of a doubt that the only names by which Campbell was referred to at trial were "Rashide Campbell" or "Tony" as the parties had so stipulated. Campbell's suggestion that the trial judge somehow abused his discretion by allowing him to be identified at trial exactly as agreed upon is patently ludicrous.

about past sales invited the jury to improperly convict him on "propensity evidence," rather than the crime actually charged. And, if those arguments fail, he further argues that even if admissible, the probative value of the evidence of past drug transactions was so outweighed by the danger of unfair prejudice that the trial judge abused his discretion by declining to exclude it under Rule 403 of the Federal Rules of Evidence. These alleged errors, Campbell asserts, entitle him to a new trial.

The government, by contrast, says the evidence was admissible. In the government's estimation, the evidence was admitted not to show Campbell's propensity towards selling crack, but rather to "complete the story" of the charged crime. And, perhaps more importantly, the government argues that the evidence of past transactions was directly relevant to the elements of the charged crime itself, as it demonstrated Campbell's knowledge, intent, and lack of mistake with respect to the crack sale on August 22, 2011. The government goes on, suggesting that admission of the evidence did not unfairly prejudice Campbell.

## 1. The Evidence at Trial

We briefly lay out the contested evidence of prior bad acts that was admitted at trial in order to place the parties' arguments in context. It was not extensive.

Buchanan was the government's "star witness" at trial. To that end, the government introduced his live testimony, along

with recordings of three telephone conversations and one in-person conversation he had with Campbell, whom Buchanan knew as Tony. The trial judge also allowed Buchanan to testify that he had a relationship with Tony prior to August 2011, and permitted him to explain in general terms how and why they were acquainted.

The trial record shows prior drug sales were mentioned only obliquely in two of the four recorded conversations and very briefly in Buchanan's in-court explanation of the nature of their relationship. In the recorded calls, neither Buchanan nor Campbell explicitly refers to drugs, drug sales, or crack cocaine. Rather, Buchanan apologizes for not being in touch with Campbell for some time and asks if he is "still working." Buchanan then indicates he "want[ed] to get a little more than [he] did," and asks if they can "do a little more," because he would "like to get, you know, get a whole, the whole onion, you know?" In the third recorded call--the one in which Campbell told Buchanan to meet his "girlfriend"--the closest Campbell comes is his own statement that they would "get back to regular" after the August 22, 2011, transaction, which is in reality a reference to future anticipated sales. None of the other recordings contain any reference to prior drug sales.

Scant evidence of past drug sales was introduced through Buchanan's live testimony. As we discussed earlier, Buchanan explained at trial that in August 2011 he knew Campbell as Tony and that Buchanan himself used the name Josh, which was part of his

cover as an individual looking to buy drugs from Tony. Buchanan further testified that he knew Tony's voice from past phone conversations and from in-person meetings in which Buchanan obtained from Tony substances that he believed to be crack cocaine. Importantly, the rest of the testimony and audio recordings focused on the August 22, 2011, sale for which Campbell was charged.

## 2. Legal Framework

We analyze the propriety of the trial judge's admission of prior bad acts evidence under the aegis of Rules 404(b) and 403 of the Federal Rules of Evidence, and our review is for abuse of discretion. See United States v. Appolon, 715 F.3d 362, 372-73 (1st Cir.) (trial court's admission or exclusion of evidence regarding prior uncharged conduct reviewed for abuse of discretion), cert. denied, 134 S. Ct. 335 (2013); United States v. DeSimone, 699 F.3d 113, 125 (1st Cir. 2012) (trial court's Rule 403 balancing determinations reviewed for abuse of discretion).

Rule 404(b)'s familiar language provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). As we have explained, Rule 404(b) only prohibits evidence of prior bad acts when such evidence is introduced "for the sole purpose of proving that a defendant had a propensity to commit a crime." United States v. Rodríguez-Berríos, 573 F.3d 55,

64 (1st Cir. 2009). The Rule continues, however, and provides that this type of evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Thus, we must consider whether the evidence has "special relevance," by which we mean that it is relevant for any purpose apart from showing propensity to commit a crime. Rodríguez-Berríos, 573 F.3d at 64. If "special relevance" is found, this does not automatically mean that it should be introduced to the jury. This is because Rule 403 provides that a trial "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. In accordance with its language, however, "defendants are protected only 'against unfair prejudice, not against all prejudice.'" United States v. Gentles, 619 F.3d 75, 87 (1st Cir. 2010) (quoting United States v. Rivera-Gomez, 67 F.3d 993, 997 (1st Cir. 1995)). Under an abuse of discretion standard we afford deference to a trial judge's balancing decision, and "'[o]nly rarely--and in extraordinarily compelling circumstances-- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'" United States v. Li, 206 F.3d 78, 84-85 (1st Cir. 2000) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)).

### a) Admissibility under Rule 404(b)

We begin our two-step analysis with Rule 404(b) to determine first if this rule is an absolute bar to the contested prior bad acts evidence. Despite Campbell's protestations, the evidence of past drug transactions clearly has "special relevance" as it went towards several purposes other than establishing Campbell's propensity for selling drugs. First, it painted a picture of the relationship between Campbell and Buchanan, thereby providing the jury with context surrounding the drug sale. Buchanan's testimony explained how it was that he knew Campbell on the date of the first recorded phone call. Otherwise, the jury would be at a loss as to why Buchanan called Campbell in the first place. Buchanan's in-court testimony provided context to that conversation by explaining what he meant when he asked for "a little more" than last time and what he was looking for in a "whole onion." Buchanan's testimony further established the prior relationship between the two men, one which Campbell intended to continue into the future as evidenced by his statement that he was going to hook Buchanan up so that he would return as a customer. This "[e]vidence of prior conduct [was] admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." United States v. D'Alora, 585 F.2d 16, 20 (1st Cir. 1978) (citations omitted) (internal quotation marks omitted); see also United States v. Arias-Montoya, 967 F.2d

708, 712-13 (1st Cir. 1992) (noting evidence may have "special relevance" where it shows a "common scheme or suggested course of continuous dealing" or where "the earlier bad act [is] likely to provide context or complete the story of the one subsequently charged").

In addition, the challenged evidence corroborated Buchanan's in-court identification of Campbell, which as detailed above was contested right up to the morning of trial. Evidence of prior dealings between Buchanan and Campbell was directly relevant to establishing the identity of the individual from whom Buchanan purchased drugs on August 22, 2011. Buchanan's in-court testimony and the recorded telephone conversations demonstrated that Buchanan had known and interacted with Campbell for several months prior to the August drug deal. That Buchanan had previously purchased drugs from Campbell and spoken with him on the phone was highly relevant to Buchanan's ability to identify Campbell, both on August 22, 2011, and again at trial. Such identification evidence is not prohibited by Rule 404(b) because it has nothing at all to do with a defendant's propensity to commit a crime.

Finally, Campbell's previous sales to Buchanan were highly probative of multiple elements of the crime charged. Evidence of prior transactions was relevant to the critical questions of Campbell's knowledge that the substance was in fact crack and to show that he intended to distribute that crack.

Indeed, we have "often upheld the admission of evidence of prior narcotics involvement to prove knowledge and intent." United States v. Manning, 79 F.3d 212, 217 (1st Cir. 1996). Just as in Manning, evidence that Campbell sold drugs to Buchanan in the past makes it more likely that he was aware the substance he provided to Buchanan on August 22, 2011, was crack and that he in fact intended to distribute it to Buchanan on that day. See id.

In sum, the evidence of past drug transactions between Campbell and Buchanan was relevant to the critical issues of identity, intent, and knowledge. Moreover, it served to provide context to the first recorded telephone call and to complete the story of the relationship between the two men, which had begun months prior to his arrest and which Campbell intended to continue indefinitely into the future. As such, Rule 404(b) did not prohibit its admission.

### b) Rule 403 Analysis

Even though the evidence was not barred by Rule 404(b), our inquiry does not end there. We must focus on the second prong of the admissibility test and consider whether the evidence, although relevant, should nevertheless have been excluded under Rule 403. This requires us to determine whether the trial judge should, in the exercise of his discretion, have concluded that the evidence's probative value was substantially outweighed by the danger of unfair prejudice.

-25-

Keeping these principles in mind, we first observe that the probative value of the evidence was great. In order to secure a conviction, the government needed to prove that Campbell was the specific individual who distributed illegal drugs to Buchanan, that Campbell knew the substance was an illegal drug, and that he intended to distribute it to Buchanan. Thus, evidence showing that Campbell sold drugs to Buchanan in the past and hoped to continue selling drugs to him in the future was highly probative of these critical elements. See United States v. Spinosa, 982 F.2d 620, 628-29 (1st Cir. 1992) (finding evidence regarding the defendant's involvement in prior drug sales "highly probative of matters of special relevance in the case: knowledge, intent, and lack of accident or mistake in cocaine dealing").

Furthermore, the danger of unfair prejudice in no way "substantially outweighed" the evidence's considerable probative value. We note that when the evidence was introduced over the defendant's objection, the trial judge offered to provide the jury with a limiting instruction. However, defense counsel explicitly declined:

> The Court: All right. Now, I just want to be clear on the record, I'm perfectly happy to give you an instruction on prior [bad] acts. I assume you don't want it because you don't want to emphasize it.
>
> Mr. Maselli: Exactly, Your Honor. Thank you very much and I appreciate the opportunity.
>
> The Court: So you're waiving that?

Mr. Maselli: Yes.

Defense counsel thus made a tactical decision to turn down the court's invitation so as to avoid highlighting the past transactions to the jury.[10] While not necessarily dispositive in light of the trial judge's refusal to exclude prior acts evidence, the knowing waiver of this instruction is probative of the scant prejudice ascribed to the evidence by defense counsel, who, of course, was ideally positioned to make a contemporaneous first-hand determination as to the evidence's actual effect upon the jury.

Moreover, a fair reading of the record demonstrates the case was always presented to the jury in terms of a singular drug transaction, rather than as one link in a continuing chain of sales. In his introductory remarks, the trial judge informed the jury that Campbell was charged with "distribut[ing] cocaine base on or about August 22, 2011," which required the government to prove "beyond a reasonable doubt" that "on the date alleged . . . [Campbell] transferred cocaine base to another person." The testimony throughout trial focused precisely on that single alleged

---

[10] Thus, Campbell has waived any argument on appeal that he may have been prejudiced by the lack of a limiting instruction. It is worthwhile to note, however, that in Manning we found that a trial court's instructing the jury "about the proper use of prior bad act evidence" serves to "minimize[] any prejudicial impact of the prior drug dealing evidence." 79 F.3d at 217. Here, of course, defense counsel explicitly waived a limiting instruction. Nevertheless, the jury was told in no uncertain terms to concern itself only with the single transaction alleged to have taken place on August 22, 2011, which further blunts Campbell's claims of unfair prejudice.

transaction. Only the first recorded conversation had anything at all to do with past sales, and contained coded words for "drugs," "cocaine," and "crack" that required explanation at trial. And Buchanan's testimony touching upon the past sales was nonspecific and general, serving only to provide background information for the jury.

Furthermore, in his closing argument the prosecutor emphasized his view that the evidence proved beyond a reasonable doubt that Campbell sold drugs to Buchanan "on August 22nd," uttering that exact phrase a total of eight times. He referred to a single sale throughout, and asked the jury to find beyond a reasonable doubt that "on August 22nd, 2011, this defendant, Rashide Campbell, also known as Tony, intentionally distributed cocaine base knowing it was cocaine base." The trial judge then instructed the jury that the defendant was charged with distributing "cocaine base on or about August 22nd, 2011," and that to return a guilty verdict it must find beyond a reasonable doubt "that on or about the date alleged, the defendant transferred cocaine base to another person."

Overall, while there was some mention of prior drug transactions, the trial was clearly focused on the August 22, 2011, transaction. The prosecutor did not make any argument in his opening or closing that would have invited the jury to consider the past transactions or to convict him on the basis of uncharged

conduct. And, of course, the evidence was highly probative as it went directly to Campbell's identity, along with his knowledge, intent, and lack of mistake when he sold crack to Buchanan on August 22, 2011. As such, and after careful review of the entire record, we are satisfied the district court did not abuse its discretion by resolving the Rule 403 balancing of unfair prejudice versus probative value in favor of admitting the evidence.

### C. Sentencing

Having disposed of Campbell's objections to his conviction, we turn to his various objections regarding the length of his twenty-year sentence, which coincides with the maximum penalty for the crime charged. See 21 U.S.C. § 841(b)(1)(C). The John Doe Indictment did not allege any amount of cocaine base for which Campbell was responsible. Neither party asked for the jury to make a finding with respect to drug quantity.

At sentencing, the district court found Campbell responsible for distributing 280 grams of cocaine base. The district court applied sentencing enhancements based on its findings that Campbell had engaged in acts of violence, used a firearm in connection with the offense, and was a manager or supervisor of a drug conspiracy. These enhancements produced a guideline sentencing range well in excess of the twenty-year maximum. As such, the court imposed the maximum sentence.

Campbell now raises several objections to the sentencing procedure employed by the trial judge and asks us to return this matter for resentencing.[11]  We have carefully considered Campbell's arguments and find them to be without merit.

## 1.  Judicial factfinding after __Alleyne__

The trial judge utilized a preponderance of the evidence standard when figuring out the amount of drugs for which Campbell could be held responsible.  This was unquestionably proper under our precedent at the time of sentencing.  United States v. Mills, 710 F.3d 5, 15 (1st Cir. 2013) (recognizing drug quantities need only be found by a preponderance of the evidence).  Campbell tells us in supplemental briefing, however, that our jurisprudence in this area has since been overruled by the Supreme Court in Alleyne v. United States, 133 S. Ct. 2151 (2013).  As Alleyne was decided during the pendency of Campbell's appeal, we apply it here. Griffith v. Kentucky, 479 U.S. 314, 328 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final . . . .").

According to Campbell, in the wake of Alleyne any fact that increases a mandatory minimum sentence must now be found by a jury.  Campbell begins his attempt to convince us to vacate his

---

[11]  As the trial judge also presided over the sentencing hearing, we continue to refer to the "trial judge" in the interests of consistency.

sentence by observing that the jury convicted him of the August 22, 2011, transaction only, which the evidence at trial showed involved a total of 6.9 grams of crack. This amount and this amount alone, he says, is what the government proved beyond a reasonable doubt and could be attributable to him. According to Campbell, this drug quantity would have led to a guidelines sentencing range of between fifty-one and sixty-four months. He argues that the trial judge impermissibly imposed the maximum twenty-year sentence after finding him responsible for distribution of 280 grams of crack using the preponderance of the evidence standard. In Campbell's view, this type of judicial factfinding violates the undergirding precepts of Alleyne and requires resentencing.

While the government appears to agree with Campbell's description of Alleyne's holding, at least in broad terms, it contends that Alleyne does not have anything to say about the judicial factfinding conducted in this instance because it had no effect on the statutory range of penalties to which Campbell was exposed. At all times, according to the government, the maximum penalty by statute was a twenty-year prison term, which was not altered in any way by the trial judge's drug quantity determination. The government thus urges us to find there was no Alleyne violation. We agree with the government's position: Campbell's reliance on Alleyne is misplaced, as the Supreme Court's teaching simply does not apply here.

In _Alleyne_, the Supreme Court extended the rule requiring a jury to find, beyond a reasonable doubt, any fact that increases a maximum statutory penalty to any fact that requires imposing a statutory minimum penalty.  See _Alleyne_, 133 S. Ct. at 2160 (citing _Apprendi_ v. _New Jersey_, 530 U.S. 466, 490 (2000)).  _Alleyne_ recognizes that "a fact triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed."  _Id._  Thus, "a fact increasing either end of the [sentencing] range produces a new penalty and constitutes an ingredient of the offense."  _Id._  Such facts must be submitted to and found beyond a reasonable doubt by a jury, not by a judge utilizing a preponderance of the evidence standard at a sentencing hearing.  _Id._ at 2162-63.

While we leave an exhaustive treatment of _Alleyne_ for an appropriate case, it is sufficient for our purposes to observe that even if there is any merit to Campbell's premise about the effect of _Alleyne_--which we do not here address--his conclusion does not follow from the premise.  This is because, as the Supreme Court went to great lengths to point out, there remains a place for "judicial factfinding" at sentencing, even in the post-_Alleyne_ world.  _Id._ at 2163.  As the Court explicitly told us, judicial factfinding is still permissible "within the range authorized by law."  _Id._  The import of all this is that it remains within the sentencing court's discretion to judicially find facts informing

the sentence actually imposed, provided that any such fact does not trigger a mandatory minimum punishment or alter a statutory maximum, and that the ultimate sentence remains within the range of penalties set forth in the statute of conviction. In such a situation, Alleyne does not apply, and the sentencing court may continue to find facts based upon a preponderance of the evidence. This case aptly illustrates the principle.

The indictment against Campbell did not charge him with distribution of any specific amount of cocaine base. It simply charged distribution in violation of 21 U.S.C. § 841(a), and went on to allege that the penalty provisions found in 21 U.S.C. § 841(b)(1)(C) apply. Section 841(b)(1)(C) sets forth the maximum sentence that may be imposed on a defendant "responsible for an unspecified amount of crack." United States v. Goodine, 326 F.3d 26, 27 (1st Cir. 2003). Importantly, that section provides a ceiling, but no floor:

> . . . any person who violates subsection (a) of this section shall be sentenced as follows:
>
> * * *
>
> (1)(C) In the case of a controlled substance in schedule I or II . . . such person shall be sentenced to a term of imprisonment of not more than 20 years . . . .

21 U.S.C. § 841(b). Thus, the range of punishment for distribution of an unspecified amount of crack enshrined by statute ranges from

anywhere from no jail time at all, all the way up to twenty years' imprisonment.

As a result of the jury's guilty verdict, this is precisely the range of punishment facing Campbell, regardless of whether he distributed 6.9 grams or 280 grams of crack. And a penalty within this range--twenty years--is precisely what was meted out to him. The judicial factfinding in this case simply does not implicate Apprendi or Alleyne because it had no effect whatsoever upon the range of penalties provided by law. Alleyne, therefore, does not require us to vacate Campbell's sentence.[12]

---

[12] In his initial brief (submitted before the Supreme Court handed down Alleyne), Campbell relies on McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986), to argue that the evidence of past drug distribution introduced at the sentencing hearing was so extensive and led to such an increase in jail time that it became the "tail which wags the dog of the substantive offense." This argument is without merit in light of Alleyne and Apprendi, as neither case requires a beyond a reasonable doubt finding of drug quantity at sentencing where the drug quantity finding does not alter the minimum or maximum punishment. In addition, Campbell seemingly argues that the amount of evidence regarding the scope and duration of his drug distribution efforts introduced at the sentencing hearing somehow violated his due process rights, although he never specifies why he believes this is so. The closest he comes to an explanation appears in the next to last sentence of his brief, where Campbell asserts--without any citation to authority--that his sentence should be vacated because the large volume of evidence presented at the sentencing hearing shows "that the Government was merely trying to skirt around Mr. Campbell's fundamental right to a trial." As this objection was neither raised at sentencing nor developed in his brief, and because we conclude the trial judge did not err in his application of the Sentencing Guidelines, we do not consider this perfunctory argument.

## 2. Evidentiary Challenges

We move on. The trial judge committed reversible error, Campbell supposes, when he made certain findings with respect to drug quantity, Campbell's use of violence and/or firearms, and Campbell's role as a manager or supervisor in a drug conspiracy. According to Campbell, the trial judge erred because he based his findings on unreliable testimony and insufficient evidence. This improper factfinding, Campbell suggests, was procedural error which resulted in an increase in the upper limits of Campbell's sentencing range and thereby influenced the trial judge's final sentencing decision.

First, Campbell argues the trial judge was "manifestly unreasonable" in holding him responsible for the distribution of 280 grams of crack. Disregarding his attorney's concession in his October 9, 2012, sentencing memorandum that he could be held responsible for distribution of 105.8 grams, Campbell now takes the position that he may not be held responsible for anything more than the 6.9 grams he sold to Buchanan on August 22, 2011.[13] He posits that the trial judge's drug quantity determination was based on nothing more than uncorroborated and unreliable testimony from drug

_____

[13] Campbell's sentencing memorandum addressed both actual sales (to individuals connected to law enforcement) and estimated sales referenced in the Presentence Investigation Report and concluded, "[t]hus, adding the actual amount derived from hand to hand sales to the historical sales projected by the probation office but using more realistic figures, the total weight involved should be 105.8 grams of crack cocaine."

users who testified only in the hope of receiving leniency in their own pending drug cases.  Similarly, he argues that because the only evidence he engaged in violence, used a firearm, or acted as a manager or supervisor in a drug conspiracy was provided by these unreliable drug users, their testimony is insufficient to satisfy even a preponderance of the evidence standard.  Without these putative errors, Campbell believes that he should have been given a sentence between fifty-one and sixty-four months in length.

At their heart, Campbell's arguments boil down to griping about the quality of the evidence at the sentencing hearing, which of course was conducted by the same judge who presided at his trial and was presumably quite familiar with the issues.  Not surprisingly, the government believes ample evidence supported the judge's determinations and urges us to uphold them in their entirety.

Before diving into the record once again, we set forth the parameters of our review.  While the trial court's application of the sentencing guidelines is subject to de novo review, its findings of fact shall stand unless affected by clear error. United States v. Batchu, 724 F.3d 1, 7 (1st Cir. 2013), cert. denied, 82 U.S.L.W. 3299 (U.S. Nov. 18, 2013).  Pursuant to this standard, "we must honor the sentencing court's findings 'unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'"  United States v. Bernier, 660 F.3d

543, 545 (1st Cir. 2011) (quoting <u>Cumpiano</u> v. <u>Banco Santander P.R.</u>, 902 F.2d 148, 152 (1st Cir. 1990)).   As neither <u>Alleyne</u> nor <u>Apprendi</u> is implicated in this instance, the court needed only to find facts based on the long-standing preponderance of the evidence standard.   See <u>Mills</u>, 710 F.3d at 15.

The rules of evidence at sentencing are "considerably less rigorous" than those at trial and permit the court to consider any evidence with "'sufficient indicia of reliability to support its probable accuracy.'"  <u>United States</u> v. <u>Cintrón-Echautegui</u>, 604 F.3d 1, 6 (1st Cir. 2010) (quoting <u>United States</u> v. <u>Zapata</u>, 589 F.3d 475, 485 (1st Cir. 2009)).   Accordingly, the sentencing court may rely upon "'virtually any dependable information,'" including statements which have not been subjected to the crucible of cross-examination and information appearing in a presentence report.  <u>Id.</u> (quoting <u>United States</u> v. <u>Sklar</u>, 920 F.2d 107, 110 (1st Cir. 1990)).   When the court hears live testimony subject to cross-examination, its "plausible credibility determinations cannot be disturbed on appeal."  <u>United States</u> v. <u>Soto-Beníquez</u>, 356 F.3d 1, 52 (1st Cir. 2003).   And with respect to drug quantity, the sentencing court is not required to make drug quantity findings with exactitude but may rest its findings upon a "'reasoned estimate[]'" of the amount of drugs a defendant has been responsible for over time.  <u>Bernier</u>, 660 F.3d at 546 (alternation in original) (quoting <u>United States</u> v. <u>Platte</u>, 577 F.3d 387, 392

(1st Cir. 2009)).  Overall, a sentencing court's factual findings will stand unless affected by clear error.  <u>United States</u> v. <u>Jones</u>, 523 F.3d 31, 40-41 (1st Cir. 2008).

Here, the court considered the probation department's Presentence Investigation Report ("PSR") and live testimony from six witnesses, each of whom was subject to cross-examination. Campbell also exercised his right of allocution.  We have reviewed the sentencing record and discern no error.

Beginning with the documentary evidence, the PSR indicates the government became aware of Campbell's drug trafficking activities sometime in 2010.  As part of its investigation, the government secured the assistance of a cooperating witness, who with an undercover agent (sometimes separately and sometimes together), bought a total of 20.5 grams of a substance containing crack from Campbell in February and March of 2011.  The undercover agent engaged in three more drug buys from the end of March through the end of April 2011, obtaining an additional 18.9 grams.  The PSR also included the August 22, 2011, sale.  Although adding these transactions together yields a quantity of 47.9 grams, the parties agreed that according to the laboratory reports, the total quantity of crack distributed in these transactions amounted to 33.8 grams.

The PSR goes on to describe the scope of Campbell's drug operation in the Portland area.  According to the PSR,

Campbell—known to various witnesses as "Tony," "G," or "Glen Dixon"—partnered with another individual known as "New York" to sell crack from at least three crack houses in Portland. At some point, Campbell stopped working with "New York" and took over the operations himself, during which time he had at least four people working for him as "runners" and/or selling product out of the crack houses. Based on information from cooperating witnesses about the amount of sales at a single crack house over the course of three months, the probation department determined Campbell was responsible for the sale of at least 144 grams of crack from that location alone.

Additionally, the PSR indicates Campbell had committed acts that could result in a stiffer sentence. Specifically, the PSR concluded that Campbell attempted to conceal his identity when he was arrested. With respect to his drug dealing, the PSR concluded Campbell acted as a manager or supervisor, physically assaulted an associate during the course of drug dealing, and used a minor in his criminal activities. All told, the PSR states Campbell's total offense level is thirty-seven, translating to a guideline sentence of seventeen-and-a-half to nearly twenty-two years behind bars. See U.S.S.G. Sentencing Table (2011).

But this is not all the trial judge had available to consider. At the sentencing hearing, the government called three witnesses to testify regarding Campbell's drug sales, along with a

law enforcement agent (not Buchanan) who testified to Campbell's use of aliases.  Campbell called two witnesses to speak on his behalf.  Each of these witnesses was subjected to cross-examination.

An exhaustive review of the sentencing testimony is unnecessary.  It is enough to note that evidence was introduced of the facts we now relate.

The government's three witnesses knew Campbell as "Tony" or "G."  He was "business partners" with another individual they knew only as "New York."  Campbell and "New York" worked together to bring drugs in from out-of-state to sell in Portland.  Their partnership lasted approximately nine months before they had a falling out, after which Campbell went off on his own and took over certain of the drug selling locations.

During the nine months Campbell and "New York" worked together, numerous individuals--between twenty and twenty-five according to one witness--worked for them, selling drugs out of multiple crack houses in the Portland area.  A typical day at just one of those locations resulted in sales to between twenty to twenty-five customers on a "bad day" and seventy-five to one hundred customers on a "good day."  On a "bad day," customers would generally purchase a "50 piece," which costs $50 and usually contains .2 to .3 grams of crack.  The particular crack house referred to by the witnesses was open for business twenty-four

hours per day, seven days a week, with sales ranging from $500 on a slow day to $5,000 or more on a busy day.

There was also evidence that Campbell committed a violent assault on another drug dealer. One witness testified Campbell came to her apartment--which Campbell had used for selling drugs-- while a "kid" who did not work for him was there selling. Campbell then waved a handgun around and hit the "kid" with it. Another witness told the court that Campbell specifically went to the apartment so he could fight the "kid." This second witness opened the door to let Campbell in, saw him enter with a gun in hand, and later found out that Campbell "bashed this kid in the face" with it.

After taking testimony, the trial judge stated he would find the facts set forth in the PSR. He also found Campbell responsible for "at least 280 grams of cocaine base," a number he described as "very conservative" because Campbell "could reasonably have been held accountable for several times that amount." The judge also found that Campbell engaged in violence, possessed a firearm in connection with his drug sales, and "was a supervisor/manager of [a] drug conspiracy which was, in [his] view, extensive and prolonged and consisted of more than five people that operated out of multiple locations and operated for extended periods of time." Finally, the judge added an enhancement for obstruction of justice because Campbell used a "false name in order

to confuse the booking procedure." The drug quantity and enhancements resulted in a guidelines range of twenty-seven to almost thirty-four years. The judge, however, imposed a twenty-year sentence to comport with the statutory maximum.

Despite the amount of evidence introduced at sentencing, Campbell would have us find the trial judge erred in his drug quantity determination and sentence enhancement findings. We are not convinced.

First, there is no doubt the trial judge found the government's witnesses credible and accepted their testimony in large measure. The record reveals their testimony was generally consistent not just with the other witnesses, but also with the PSR. Rigorous cross-examination exposed any infirmities or bias on the part of the witnesses. As we do not have the benefit of observing the witnesses and evaluating their demeanor, we are loath to disturb the district court's credibility determinations, which we certainly consider "plausible." Therefore, we uphold the district court's imposition of enhancements for use of violence, possession of a firearm, and for being a manager/supervisor in a drug conspiracy, based as they were on credible witness testimony and reliable information in the PSR.

This leaves us with Campbell's challenge of the trial judge's drug quantity determination, which only needed to be a reasoned estimate of the amount of drugs for which Campbell was

responsible.  See Bernier, 660 F.3d at 546.  Like the others, this finding was based in large part on the trial judge's evaluation of live witness testimony regarding Campbell's drug operation, which already puts Campbell's argument in a deep hole.  In addition, we agree with the trial judge's description of 280 grams as a "very conservative" number in light of the evidence introduced at sentencing.  Taking the minimum sales and drug weights testified to--and at the same time completely ignoring the "good days," sales at other crack houses, and all sales after Campbell split from "New York"--yields more than 1,000 grams sold from that one crack house over the course of nine months, a number far in excess of the 280 grams found by the trial judge.

We further note that the PSR concluded Campbell was responsible for distributing at least 144 grams of crack in a three-month period.  This extrapolates to a nine-month total of 432 grams, which when added to the 33.8 grams to which Campbell conceded yields a total of 465.8 grams.  Thus, the documentary evidence alone provides support for the trial judge's finding that Campbell was responsible for distribution of at least 280 grams of crack.

The trial judge, of course, was entitled to rely on the witness testimony, the PSR, or a combination of the two.  Even applying the most conservative estimates available leads to a drug quantity finding in excess of 280 grams.  We are satisfied,

therefore, that the trial court made a reasoned estimate of drug quantity based upon the evidence before it.

In sum, Campbell's challenge to the district court's findings of fact is without merit. Far from leaving us with the unyielding feeling that a mistake has been made, the trial judge's sober consideration of the PSR and live testimony strikes us as eminently reasonable. The court correctly determined that the combination of drug quantity and sentence enhancements translated to a guidelines range in excess of the statutory maximum, and appropriately reduced the sentence to conform with that maximum. Once again, there was no error.

## CONCLUSION

Campbell has not convinced us that his trial or sentence was affected by any error. His conviction and sentence are hereby **affirmed** in all respects.